UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FAYETTEVILLE DIVISION

TIMOTHY M. McCONNELL                                                                                      PLAINTIFF

v.                                               No. 5:22-CV-05071

ALEJANDRO MAYORKAS,
Secretary of United States Department
of Homeland Security                                                                                      DEFENDANT

**OPINION AND ORDER**

Before the Court are Defendant Alejandro Mayorkas's ("Secretary") motion for summary judgment (Doc. 19), brief in support (Doc. 20), and statement of facts (Doc. 21). Plaintiff Timothy McConnell filed a response in opposition (Doc. 26), statement of facts (Doc. 27), and brief in support of his response (Doc. 28). The Secretary filed a reply (Doc. 33) as well as a response to Mr. McConnell's statement of facts (Doc. 34). For the reasons given below, the motion will be GRANTED.

**I.   Background**[1]

This case arises out of Mr. McConnell's employment with the Transportation Security Administration ("TSA"). Mr. McConnell worked for the TSA as a Transportation Security Officer at the Northwest Arkansas National Airport for about seven years. (Doc. 34, ¶ 1). Throughout his employment with the TSA, Mr. McConnell filed five equal employment opportunity ("EEO") complaints. *Id.* ¶ 2. The record contains the EEO counselor reports for those complaints. *See* Doc. 19-1. Two of those complaints refer to what the Court will call the "Polo Shirt Incident."

---

[1] These facts are taken from the parties' statements of fact. *See* Docs. 21, 27, 34. Mr. McConnell did not directly address the Secretary's statement of facts, so those facts will be deemed admitted unless separately controverted in Mr. McConnell's statement of facts. *See* Doc. 16, p. 3; W.D. Ark. Local R. 56.1(c).

1

The Polo Shirt Incident took place on January 31, 2020. (Doc. 34, ¶ 8). Mr. McConnell was scheduled to work the baggage checkpoint but was reassigned to work the passenger checkpoint after arriving at work. *Id.* ¶ 9. This reassignment matters because the required uniform varies by assignment. *Id.* ¶¶ 9–10. Working the baggage checkpoint requires wearing a TSA-issued polo shirt, while working the passenger checkpoint requires wearing a TSA-issued button-down shirt. *Id.* Mr. McConnell did not have his button-down shirt, so he was directed to clock out and return home to get his shirt. *Id.*; Doc. 21, ¶ 6. Mr. McConnell returned home to get his shirt, but he did not clock out during that trip. (Doc. 34, ¶ 11). The trip home took between 30 to 45 minutes, and when he returned, Mr. McConnell worked the remainder of his shift. (Doc. 21, ¶ 7).

As a result of the Polo Shirt Incident, the TSA assessed Mr. McConnell an AWOL charge, which carried a 14-day suspension. *Id.* ¶ 8; Doc. 34, ¶ 13. Mr. McConnell filed two EEO complaints about this incident: one about his supervisor's conduct and the AWOL charge,[2] and a second about the 14-day suspension.[3] These complaints were later combined for a hearing before an EEOC administrative judge. (Doc. 21, ¶ 11). While those complaints were pending, a second incident occurred, which the Court will call the "Locker Incident."

The Locker Incident took place on June 16, 2021. (Doc. 34, ¶ 14). On that day, Mr. McConnell saw a coworker, Sherri Wise, wearing a polo shirt at the baggage checkpoint. *Id.* Later in the shift, a supervisor asked Ms. Wise to temporarily relocate to the passenger screening checkpoint. *Id.* ¶ 15. Unlike Mr. McConnell, nobody told Ms. Wise to change into the required button-down shirt. *Id.* Ms. Wise was not reprimanded. *Id.* ¶ 16. Instead, her supervisor received

---

[2] *See* Doc. 19-1, pp. 14–17 (Case number HS-TSA-00861-2020, filed February 4, 2020).

[3] *See* Doc. 19-1, pp. 18–21 (Case number HS-TSA-01889-2020, filed July 24, 2020).

2

a Letter of Reprimand for incorrectly directing her to work at the passenger checkpoint in a polo shirt. *Id.*  The Secretary admits that it was an error to direct Ms. Wise to work at the passenger checkpoint in the polo shirt. *Id.* ¶ 17.

Mr. McConnell, seizing the opportunity to collect evidence to support his EEO complaints, used his lunch break to submit a FOIA request with the airport police for the CCTV footage of the checkpoint. *Id.* ¶ 19.  Mr. McConnell was still in his TSA uniform but told the airport police he was using the CCTV footage for a personal reason. *Id.* ¶ 20; Doc. 21, ¶ 20.  Airport police later brought Mr. McConnell a disc containing the CCTV footage. (Doc. 21, ¶ 22).  Mr. McConnell continued his search for evidence on his next break. (Doc. 34, ¶ 21).  During that break, he went to Ms. Wise's locker, opened it, and photographed its contents on his phone. *Id.* ¶¶ 21–22; Doc. 21, ¶ 32.  There was no button-down in Ms. Wise's locker. (Doc. 34, ¶ 22).  Mr. McConnell believes this showed Ms. Wise should have been asked to go get her button down shirt from home like he was asked to do.

The next day, Mr. McConnell told Ms. Wise's supervisor that he had a photo of Ms. Wise's locker showing there was no button-down. *Id.* ¶ 24.  Ms. Wise's supervisor told her about the photo. *Id.*  She became very angry. *Id.* ¶ 25.  Ms. Wise then pulled Mr. McConnell into a manager's office and, with a different supervisor present, yelled at Mr. McConnell for invading her privacy. *Id.*  After the Locker Incident, supervisors investigated the incident and changed Mr. McConnell's duties. *Id.* ¶ 38.  He had to perform menial tasks in the breakroom rather than work at either checkpoint. *Id.*  About three weeks after the incident, supervisors changed his schedule, making him ineligible for the night-pay rate. *Id.* ¶ 39.

Finally, on August 12, Mr. McConnell received a Notice of Proposed Removal. *See* Doc. 19-10.  The notice alleged two charges: misuse of position for requesting the CCTV footage and

inappropriate conduct for photographing Ms. Wise's locker. *Id.* at 1. Just under two months later, Jamie Hicks, the Assistant Federal Security Director, issued a Notice of Removal. *See* Doc. 19-11. The removal terminated Mr. McConnell based on the two charges. *Id.* at 1. It was effective upon receipt, which was October 7, 2021. *Id.* at 10.

Mr. McConnell filed a sixth EEO complaint on October 13, alleging his removal was retaliation for filing the five previous EEO complaints. (Doc. 19-1, pp. 22–25). That sixth complaint led to this action. Mr. McConnell sued the Secretary for one count of retaliation in violation of Title VII, 42 U.S.C. § 2000e, *et seq.* (Doc. 13). He alleged the Secretary took an adverse employment action by terminating his employment. *Id.* ¶ 38. He alleged his protected activity was filing the five charges of discrimination. *Id.* ¶ 36. And he alleged the Secretary's investigation and eventual termination based on the CCTV request and Locker Incident was a pretext for discrimination. *Id.* ¶ 41.

## II. Legal Standard

On a motion for summary judgment, the moving party has the burden to show that there is no genuine dispute of material fact and that it is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). Facts are material when they can "affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Disputes are genuine when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* "[A] nonmovant may not rest upon mere denials or allegations, but must instead set forth specific facts sufficient to raise a genuine issue for trial." *Haggenmiller v. ABM Parking Servs., Inc.*, 837 F.3d 879, 884 (8th Cir. 2016) (quotations omitted). The record must be construed in the nonmovant's favor, with "the 'benefit of all reasonable inferences in the record.'" *Schottel v. Neb. State Coll. Sys.*, 42 F.4th 976, 981 (8th Cir. 2022) (quotation omitted).

**III.   Analysis**

Mr. McConnell can attempt to defeat the summary judgment motion in two ways.  One way is to show direct evidence of retaliation.  In the discrimination context, direct evidence is not the converse of circumstantial evidence.  *Griffith v. City of Des Moines*, 387 F.3d 733, 736 (8th Cir. 2004).  Rather, direct evidence refers to the "causal strength of proof." *Id.*  Direct evidence "demonstrates a specific link between a materially adverse action and the protected conduct, sufficient to support a finding by a reasonable fact finder that the harmful adverse action was in retaliation for the protected conduct." *Young-Losee v. Graphic Packaging Intern., Inc.*, 631 F.3d 909, 912 (8th Cir. 2011).  Finally, "'direct evidence . . . must relate to people with decision-making authority' and does not include 'stray remarks in the workplace' or 'statements by nondecisionmakers.'" *Sellars v. CRST Expedited, Inc.*, 13 F.4th 681, 693 (8th Cir. 2021) (quoting *Moody v. Vozel*, 771 F.3d 1093, 1096 (8th Cir. 2014)).

The second way to overcome summary judgment is by showing indirect evidence of retaliation under the *McDonnell Douglas*[4] burden-shifting framework.  *See Bell v. Baptist Health*, 60 F.4th 1198, 1203 (8th Cir. 2023) (*McDonnell Douglas* framework applies to Title VII retaliation cases).  This framework involves a three-step process.  First, the plaintiff must establish a *prima facie* case that would permit a reasonable jury to find that: (1) the plaintiff engaged in protected conduct; (2) the plaintiff suffered an adverse employment action; and (3) the adverse action was causally linked to the protected conduct.  *See Gibson v. Concrete Equip. Co., Inc.*, 960 F.3d 1057, 1064 (8th Cir. 2020).  If the plaintiff establishes a *prima facie* case, then at the second step the burden shifts to the defendant to "show a legitimate reason for its actions." *See id.* (internal alterations omitted).  "If such a reason is proffered," then at the third step the burden shifts back

---

[4] *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).

to the plaintiff to "present evidence that (1) creates a question of fact as to whether [the defendant]'s reason was pretextual and (2) creates a reasonable inference that [the defendant] acted in retaliation." *See id.*

**A. Direct Evidence**

Mr. McConnell first argues that he can defeat summary judgment with direct evidence of discrimination. Mr. McConnell points to the fallout of the Locker Incident to show there is direct evidence. Specifically, he references being "accosted" by Transportation Security Manager Joseph Collins who told Mr. McConnell not to investigate his EEO complaint. (Doc. 28, p. 13). This evidence does not show the required strong causal link between a materially adverse action and protected conduct to satisfy the direct evidence requirement.

First, as will be discussed further below, Mr. McConnell's personal investigation during the Locker Incident was not a protected activity. Mr. McConnell's two investigative actions—submitting a request for the CCTV footage and entering Ms. Wise's locker—were private actions not taken in accordance with any official investigation of his complaint. Mr. Collins was angry with Mr. McConnell because Mr. Collins believed that requesting the CCTV footage violated TSA policy on releasing sensitive security information and stated Mr. McConnell's actions would be investigated. (Doc. 34, pp. 18–19). Mr. Collins' anger, justified or not, was not connected to Mr. McConnell's protected activity of filing an EEO complaint. Mr. Collins' anger was instead focused on what he believed to be violations of TSA policy.

Second, even though Mr. Collins told Mr. McConnell not to investigate the EEO claim, Mr. Collins was not a decisionmaker, so his comments cannot be direct evidence of discrimination. *See Torgerson v. City of Rochester*, 643 F.3d 1031, 1044–45 (8th Cir. 2011) (collecting cases). In his complaint, Mr. McConnell alleged the adverse employment action was his termination. (Doc.

6

13, ¶ 38).  Jamie Hicks decided to terminate Mr. McConnell's employment.  (Doc. 19-11, p. 1). Also, other supervisors—Dawn Watkins and Kristena McCraig—changed Mr. McConnell's duties and work schedule based on their investigation of the Locker Incident.  *See* Doc. 34, ¶¶ 31, 38. Mr. Collins did not make any of these decisions, so right or wrong, his comments were statements made by a nondecisionmaker that cannot be used as direct evidence.  *See Torgerson*, 643 F.3d at 1044.   Finally, Mr. McConnell has not shown that Mr. Collins influenced any of the decisionmakers.  *See id.* (citing *Arraleh v. Cnty. of Ramsey*, 461 F.3d 967, 975 (8th Cir. 2006)) (remarks by county employee not direct evidence because no evidence the comments influenced decisionmakers).  Therefore, Mr. McConnell has not produced direct evidence of discrimination, so the Court will turn to the *McDonnell Douglas* inquiry.

### B.  Prima Facie Case

To make out a *prima facie* case of retaliation, Mr. McConnell must show (1) he engaged in protected activity, (2) he suffered an adverse employment action, and (3) the adverse action was causally linked to the protected conduct.  *See Gibson*, 960 F.3d at 1064.  Specifically, Mr. McConnell must show that his protected activity was the but-for cause of the adverse action. *Schottel*, 42 F.4th at 983.  The Secretary does not dispute that Mr. McConnell's filing of EEO complaints and termination are protected activities and adverse employment actions respectively. (Doc. 20, p. 4).  Generally, the Court would move to third prong, but Mr. McConnell states that the Secretary ignores other protected activities and adverse actions.  The Court will therefore consider these arguments before turning to causation.[5]

---

[5] The Secretary argues that the Court should disregard these arguments because they expand the allegations from the operative complaint. (Doc. 33, p. 1) (citing *N. States Power Co. v. Fed. Transit Admin.*, 358 F.3d 1050, 1057 (8th Cir. 2004) (parties cannot manufacture claims late in litigation to avoid summary judgment)). The Secretary is likely correct because the operative complaint alleged the only protected activity was filing EEO complaints and the only

1. **Protected Activities**

Mr. McConnell argues that, in addition to filing his EEO complaints, his investigation into those complaints also counts as protected activity. (Doc. 28, p. 3). Mr. McConnell points out it is unlawful to discriminate against an employee "because he has made a charge, testified, assisted, or *participated in any manner in an investigation*, proceeding, or hearing under this subchapter." 42 U.S.C. § 2000e-3(a) (emphasis added). He then argues that he was retaliated against for conducting his personal investigation during the Locker Incident. The question thus becomes: Does Mr. McConnell's private investigation of his EEO complaint constitute a protected activity? The Court answers no.

Mr. McConnell's investigation was not a protected activity because it was not taken "under this subchapter." 42 U.S.C. § 2000e-3(a). Courts refer to the section Mr. McConnell relies on as the "participation clause." *See, e.g.*, *Lopez v. Whirlpool Corp.*, 989 F.3d 656, 664 (8th Cir. 2021). Importantly, the participation clause is limited by the "under this subchapter" language. Courts have unanimously held that participating in internal employer investigations not connected to formal EEOC proceedings does not qualify as a protected activity. *Townsend v. Benjamin Enters., Inc.*, 679 F.3d 41, 49 (2d Cir. 2012) (collecting cases). However, at least one court has held participating in an employer's internal investigation taken *after* a pending EEOC charge has been filed is protected activity. *Abbott v. Crown Motor Co.*, 348 F.3d 537, 543 (6th Cir. 2003). Here, the facts do not fall squarely under either scenario.

---

adverse action was the termination. *See* Doc. 13, ¶¶ 35, 38. Despite this, the Court will address the arguments on the merits in the interest of judicial economy.

Mr. McConnell had a pending EEO complaint against his employer before he began his investigation. *See* Doc. 21, ¶ 11.[6] But Mr. McConnell's investigation was not conducted as part of an official investigation by the EEOC or even an internal investigation by his employer. Moreover, Mr. McConnell has not presented any evidence that he was designated by either the EEOC or his employer to independently investigate his charge. *See Gilooly v. Mo. Dep't of Health & Senior Services*, 421 F.3d 734, 742 (8th Cir. 2005) (Colloton, J., concurring in part and dissenting in part) (Title VII protection does not extend to participation in "an employer's internal investigation that is independent of the 'subchapter,' *i.e.*, not pursuant to an investigation by the EEOC or its designee"). In short, his actions were not taken "under this subchapter" because his personal investigation was not taken by the EEOC or its designee. If Mr. McConnell wanted to use evidence from the Locker Incident to support his case, he could have alerted the EEOC, which has subpoena power. *See Jackson v. St. Joseph State Hosp.*, 840 F.2d 1387, 1390 (8th Cir. 1988) ("[S]ince the EEOC has subpoena power, [Plaintiff] had other less objectionable and disruptive avenues open for obtaining [Witness's] testimony.").

Using Mr. McConnell's definition of "investigation" would expand the scope of the participation clause beyond the language of the statute. *Cf. Hatmaker v. Mem. Med. Ctr.*, 619 F.3d 741, 747 (7th Cir. 2010) ("To bring an internal investigation within the scope of the clause we would have to rewrite the statute."). Mr. McConnell's interpretation of the statute would ignore the "under this subchapter" language and could expand Title VII's coverage to all types of personal investigations unrelated to official investigations. The Eighth Circuit has not expanded Title VII's coverage to an employee's personal investigation of its claim, so the Court will not read this section

---

[6] At the time of summary judgment briefing, the earlier charges related to the Polo Incident were still pending before an EEOC administrative judge. (Doc. 21, ¶ 11).

so broadly.  Therefore, Mr. McConnell's actions in the Locker Incident are not protected activity. Mr. McConnell's only protected activity was filing his EEO complaints.

### 2. Adverse Employment Actions

Mr. McConnell next argues that, in addition to his termination, his changed duties and loss of pay constitute adverse employment actions. (Doc. 28, p. 3).  The Secretary's only argument about these lesser actions is that Mr. McConnell did not allege them in his operative complaint, so the Court should not allow Mr. McConnell to re-frame his pleading. (Doc. 33, p. 12) (citing *N. States Power Co.*, 358 F.3d at 1057).  Nevertheless, the Secretary agreed to assume that the changed duties and decreased pay are adverse actions. *Id.*  The Court will assume the same and move to the final element of a *prima facie* case.

### 3. Causal Connection

Having shown that he engaged in protected activity and suffered an adverse action, Mr. McConnell must now show the protected activity was the but-for cause of the adverse action. *Schottel*, 42 F.4th at 983.  Again, his only protected activity was filing EEO charges.  Mr. McConnell filed those charges in February and July 2020. *See* Doc. 19-1, pp. 14–21.  His adverse employment actions were changed duties, loss of pay, and termination.  The earliest adverse actions occurred in late June 2021 after the Locker Incident. (Doc. 34, ¶¶ 38–39).  The TSA terminated Mr. McConnell in October 2021. (Doc. 19-11).  With those undisputed facts in place, the Court will turn to Mr. McConnell's causation argument.

Mr. McConnell's causation argument fails because of the amount of time between his protected activity and the adverse actions.  There is an eleven-month gap between his last charge and the adverse actions.  This gap is too far to show a causal connection based on temporal proximity.  Although the Eighth Circuit has not announced a bright-line rule, the court has held a

two-month interval "dilutes any inference of causation." *Kipp v. Mo. Highway & Transp. Comm'n*, 280 F.3d 893, 897 (8th Cir. 2002). Even a one-week period between EEOC charge and termination has been held insufficient when the plaintiff only relied on temporal proximity. *Bunch v. Univ. Ark. Bd. Trs.*, 863 F.3d 1062, 1069 (8th Cir. 2017); *but see Wilson v. Ark. Dep't of Human Servs.*, 850 F.3d 368, 373 (8th Cir. 2017) (six-week span between EEOC charge and the termination plausibly alleged but-for causal connection). Given this precedent and the eleven-month gap between charge and adverse action, Mr. McConnell cannot rely on temporal proximity to support an inference of causation.[7]

Mr. McConnell also posits he was treated differently from four similarly situated employees, which he claims proves it was his protected action that caused his termination. The Eighth Circuit has recognized an employee can prove causation through disparate treatment of similarly situated employees. *See Fercello v. Cnty. of Ramsey*, 612 F.3d 1069, 1082 (8th Cir. 2010) (citing *Hicks v. Baines*, 593 F.3d 159, 170 (2d Cir. 2010)). However, the Eighth Circuit has created an exacting standard when it comes to identifying comparators. Comparators must have the same job. *Fercello*, 612 F.3d at 1082. Comparators must also have had the same disciplinary history. *See Gilmore v. AT&T*, 319 F.3d 1042, 1046 (8th Cir. 2003). Comparators also generally must have the same supervisor and have engaged in the same conduct. *Ebersole v. Novo Nordisk, Inc.*, 758 F.3d 917, 925 (8th Cir. 2014) (citation omitted). In short, "the plaintiff's 'comparators' must be 'similarly situated in all relevant respects.'" *Id.* (quotation omitted).

---

[7] Even if there was a closer temporal connection between the protected activity and adverse actions, the Secretary has a "lawful, obvious alternative explanation . . . that renders [Mr. McConnell's] theory of causation based on temporal proximity implausible[,]" which is his coworker's complaint about the Locker Incident. *See Schottel*, 42 F.4th at 984 (cleaned up).

All four of Mr. McConnell's alleged comparators fail to be similarly situated for various reasons. First, Dawn Watkins is not similarly situated because she had a different job title. Ms. Watkins was a Supervisory Transportation Security Officer while Mr. McConnell was only a Transportation Security Officer. (Doc. 27, ¶¶ 1, 25). Second, Dennis Heath is not similarly situated because while he opened a locker, there is no evidence that he photographed the coworker's locker without their permission. (Doc. 21, ¶ 41). Third and fourth, Sherri Wise and Kaylene Campbell are not similarly situated because they did not engage in the same conduct as Mr. McConnell. Mr. McConnell does not cite any evidence that Ms. Wise or Ms. Campbell opened others' lockers or requested CCTV footage, which is what Mr. McConnell was punished for. After reviewing Mr. McConnell's complaint and deposition, it appears he felt Ms. Wise and Ms. Campbell were treated more favorably when they wore polo shirts while on passenger checkpoint duty. *See* Doc. 13, ¶ 13; Doc. 19-12, p. 5. But it is undisputed that Mr. McConnell was terminated for his behavior in the Locker Incident, not for failing to wear a polo shirt. *See* Doc. 19-11. Based on the above, none of Mr. McConnell's alleged comparators were similarly situated in all respects, so Mr. McConnell has failed to create an issue of fact on the issue of causation. *See Fercello*, 612 F.3d at 1082.

Put simply, an employee fails to make out a *prima facie* case when the employee is fired under a company disciplinary policy rather than in response to an employee's complaints about discriminatory conduct. *Shirrell v. St. Francis Med. Ctr.*, 793 F.3d 881, 888 (8th Cir. 2015). That is precisely what happened here. The Secretary terminated Mr. McConnell for misusing his position and opening a coworker's locker to photograph its contents without her permission. He has not raised a question of fact that the filing of his EEO complaints caused his termination.

In sum, Mr. McConnell has provided evidence to show the first two elements of a *prima facie* case but not the third. Mr. McConnell engaged in protected activity when he filed EEO complaints. And Mr. McConnell suffered adverse employment actions, the most serious of which was his termination. But Mr. McConnell did not connect the first two elements causally, so Mr. McConnell has not set forth a *prima facie* case of retaliation. Therefore, the Secretary is entitled to summary judgment on Mr. McConnell's retaliation claim.

### C. Pretext

Even if Mr. McConnell established a *prima facie* case, Mr. McConnell cannot show the Secretary's legitimate reason for his termination was pretext for retaliation. The Secretary sets forth the legitimate reasons for Mr. McConnell's termination in the notice of removal. *See* Doc. 19-11. In short, the legitimate reasons boil down to the actions Mr. McConnell took in the Locker Incident. The Secretary terminated Mr. McConnell for misusing his position to obtain the CCTV video for personal use and engaging in inappropriate conduct by taking a photo of Ms. Wise's locker without her permission. *Id.* at 1. Violating company policies is a legitimate reason for terminating employees. *See Ebersole*, 758 F.3d at 925 (citation omitted). Because the Secretary had a legitimate reason for Mr. McConnell's termination, the Court turns to pretext.

"To show pretext, the [employee] must both discredit [the employer's] proffered reasons for the alleged retaliatory action and show that the circumstances permit drawing a reasonable inference that retaliation was the real reason for the adverse employment action." *Sellars*, 13 F.4th at 694. "It is possible for strong evidence of a prima facie case to establish pretext as well . . . ." *Smith v. Allen Health Sys., Inc.*, 302 F.3d 827, 834 (8th Cir. 2002). An employee can also show pretext by (1) challenging the employer's reason for the termination, (2) showing they received favorable performance reviews before their termination, (3) providing similarly situated

13

employees who were treated more leniently, (4) explaining the employer changed its asserted reason, or (5) demonstrating the employer did not follow its policies. *Ebersole*, 758 F.3d at 925.

Mr. McConnell has not presented evidence showing any of these forms of pretext. Mr. McConnell's briefing on this issue focuses on the temporal proximity of the adverse actions and the alleged comparators. But as shown above, the comparators were not similarly situated to Mr. McConnell, so they cannot be used as evidence of pretext. Also, as explained above, the temporal proximity was quite distant—eleven months—and the Secretary has a lawful alternative explanation for any proximity, which was that Mr. McConnell's misuse of position led to the Secretary's investigation. Mr. McConnell does not otherwise show the Secretary changed his reason for the termination, failed to follow TSA policies, or even that Mr. McConnell had favorable reviews. Altogether, even assuming Mr. McConnell made out a *prima facie* case, he has not raised an issue of fact at the pretext step of the *McDonnell Douglas* framework, so the Secretary is entitled to summary judgment on his retaliation claim for this reason too.

## IV. Conclusion

IT IS THEREFORE ORDERED that the Secretary's motion for summary judgment (Doc. 19) is GRANTED and Mr. McConnell's claims are DISMISSED WITH PREJUDICE. Judgment will be entered accordingly.

IT IS SO ORDERED this 7th day of August, 2023.

/s/ P. K. Holmes, III
P.K. HOLMES, III
U.S. DISTRICT JUDGE